NANCY NARDUCCI *vs.* CONTRIBUTORY RETIREMENT APPEAL
BOARD & another.[1]

No. 05-P-1356.

Suffolk. June 8, 2006. - January 31, 2007.

Present: GRASSO, DOERFER, & MILLS, JJ.

*Contributory Retirement Appeal Board. Proximate Cause. Public Employment,* Accidental disability retirement.

In proceedings before an administrative magistrate (magistrate) concerning the plaintiff's claim for accidental disability retirement benefits, the magistrate, when determining whether the plaintiff had carried her burden of proof on the issue of causation, did not err in considering certificates and narratives of the physicians who comprised the regional medical panel that evaluated the plaintiff's claim. [134-136] MILLS, J., dissenting.

This court declined to rule, as matter of law, that a plaintiff seeking accidental disability retirement benefits before the Contributory Retirement Appeal Board established that the air quality in her work place proximately caused her to be disabled. [136-137] MILLS, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on March 22, 2004.

The case was heard by *Charles T. Spurlock,* J., on a motion for judgment on the pleadings.

*Jerry C. Effren* for the plaintiff.

*James H. Salvie,* Special Assistant Attorney General, for Teachers' Retirement Board.

DOERFER, J. On the basis of a hearing before an administrative magistrate (AM), the plaintiff's claim for accidental disability retirement benefits was denied by the Contributory Retirement Appeal Board (CRAB). In this appeal from a Superior Court judgment upholding the CRAB decision, the plaintiff asks us to rule, as matter of law, that she established that the air quality in her work place proximately caused her to be disabled. We decline to do so, and uphold the ruling of CRAB.

[1]Teachers' Retirement Board.

*Plaintiff's claim.* Beginning in September of 1993, the plaintiff, a music teacher in the Natick public schools, complained of headaches, head congestion, and, eventually, respiratory difficulties. She began treatment with her physician for sinusitis, without relief. From November 12, 1993, to January 3, 1994, she took sick leave (except for the holidays, which did not count as sick leave). At that time she was diagnosed with viral bronchitis. The plaintiff thereafter began a long series of consultations with various clinicians, who came to support her claim of work-related illness. She stopped going to work after returning for one half day on March 1, 1994, and began to receive workers' compensation benefits under G. L. c. 152. Eventually, on December 7, 1995, she filed a claim for accidental disability retirement under G. L. c. 32, § 7(1), with the Teachers' Retirement Board (TRB). After a hearing before the AM, the plaintiff's claim was denied. Her appeal to CRAB followed. CRAB adopted the AM's decision as its own, and CRAB's decision was affirmed on further appeal to the Superior Court.

The main difficulty with the plaintiff's claim was to demonstrate the requisite causal connection between her medical condition and the environment in which she worked. The plaintiff was required to prove her disablement was "by reason of . . . a hazard undergone as a result of, and while in the performance of, [her] duties" of employment. *Blanchette* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 479, 482 (1985), quoting from G. L. c. 32, § 7(1), as appearing in St. 1982, c. 630, § 18.[2] That is, the plaintiff's proof had to satisfy CRAB that her disability was the "natural and proximate result" of the hazard undergone. *Campbell* v. *Contributory Retirement Appeal Bd.*, 17 Mass. App. Ct. 1018, 1018-1019 (1984), quoting from G. L. c. 32, § 6(3)(*a*), as amended by St. 1946, c. 603, § 2. See *Blanchette* v. *Contributory Retirement Appeal Bd.*, *supra* at 483, 485. To succeed, therefore, she had to establish that her condition was caused by environmental factors in the work place and not due to some other common etiology. The plaintiff also had to rule out environmental factors

_____

[2]The permanency and totality of the plaintiff's disability are not at issue in this appeal, nor is the personal injury prong of the statute.

other than her school environment or to find some other way of directly linking her school environment to her illness. In the context of this claim (which is for disability based upon a gradual deterioration at work, and not upon some sudden traumatic event), she had to show as part of her case that she was exposed at work to a hazard "not common and necessary to all or a great many occupations." *Blanchette* v. *Contributory Retirement Appeal Bd., supra* at 485, quoting from *Kelly's Case,* 394 Mass. 684, 688 (1985). The plaintiff had the burden of proof on the causation issue. *Campbell* v. *Contributory Retirement Appeal Bd., supra* at 1019. *Lisbon* v. *Contributory Retirement Appeal Bd.,* 41 Mass. App. Ct. 246, 255 (1996). In order to understand how the plaintiff approached the task of meeting this burden, we summarize the evidence before the AM that bears on the issue of causation.

The plaintiff testified at the hearing before the AM as to her job activities and the environment in which she worked. As an elementary school music teacher, she was required to speak and demonstrate songs throughout the school day. She would have time at the beginning, the middle, and the end of the school day to prepare. Because of increased enrollments she lost her own classroom at one of the schools at which she taught, the Bennett-Hemenway School, known as "the Ben-Hem." There she was required to conduct her office activities in a basement space that she said was musty and had poor ventilation. This change of location took place in the fall of 1993. She had no complaints about her working environment in the other school at which she taught, the Lilja School.

Her main evidence on causation was that her respiratory condition deteriorated markedly after she began using the basement office at the Ben-Hem, but that her condition improved when she was not exposed to the environment in that basement space. This would be consistent with a causal connection between her work environment and her physical condition. Other evidence in the record, however, fairly detracts from this conclusion. First, although she manifested symptoms of some respiratory illness when she was seen by a doctor in December, 1995, and January, 1996, the doctor was unable to verify loss of bronchial or pulmonary function at that time by clinical testing.

Her spirometry tests were within normal limits at that time. She did not respond positively to medications that would relieve such claimed conditions. The medical records in evidence noted that her complaints at this time were subjective and, in some sense, paradoxical.

To pursue the possibility of an allergic reaction mechanism the plaintiff underwent several tests. As a result she was shown to be allergic to house dust, mites, dog and cat dander, and certain mold spores. But these types of allergens are not uncommon in the environment.

The plaintiff also had a personal medical history of respiratory problems. She had been treated for many years for sinusitis, which she developed after surgery for a deviated septum in 1989. From 1989 to 1993, she experienced recurring sinus headaches, pressure, and discomfort, usually in the fall and spring. In the spring of 1993, she was treated for sinusitis. Her family history disclosed that her mother and brother had a history of asthma.

She importuned one of her physicians to support her claim of a work-related disability, and he was sympathetic. However, he advised her that her claim would be difficult to prove unless she could establish that particular allergens were present at her work place and not present in her home or elsewhere in the environment to which she was regularly exposed.

At the plaintiff's request the school department commissioned an air quality study by Universal Engineering Corporation (Universal Engineering), an environmental testing firm that examined both her work space and her home. The report of the testing was inconclusive. It failed to confirm that mold spores to which she was allergic were present in significant concentrations at her work place but not at her home. Thus her claim was not advanced by this report.

The plaintiff's case relating to causation thus rested on the following factual premises and logic: (1) she actually had respiratory difficulties closely related in time to her exposure to her work space at the Ben-Hem; (2) her self-reporting of these symptoms was reliable and significant, even though not clinically confirmed by physical examinations or objective testing close in time to the claimed effect; (3) her prior history of

respiratory illness did not explain her complaints; (4) her family history of asthma and related respiratory issues was not significant; and (5) any respiratory difficulties that occurred or persisted when she was not in contact with the Ben-Hem were not significant or were explained by other causes.

*Expert opinion evidence.* The AM admitted into evidence the medical records of the plaintiff and other documents in which various physicians commented on her condition and treatment and offered opinions as to the nature of her illness, her impairments, her prognosis, and the causes of her condition.[3]

Several doctors offered their written opinions that the plaintiff's disability was caused by her work environment. These supportive opinions credited the plaintiff's self-reporting of her symptoms and found significant that, in their view, any evidence of other identified sources of allergens or causes outside of her school environment was lacking.

It should be noted that not all of these opinions were unqualified or couched in terms of a reasonable medical certainty.[4] For example, Dr. Andrew Davidson stated, "I *suspect* that [the plaintiff and her husband] are correct in their presumed diagnosis of occupationally induced asthma from molds in the school building . . ." (emphasis supplied). "It is *still my belief* that this patient is suffering from occupational asthma as a cause of her symptoms" (emphasis supplied).

Doctor Michael Lawrence stated, "Now that we have confirmed the diagnosis of asthma with a positive Methacholine Challenge, *I do feel* that there is a definite relationship between exacerbation of [the plaintiff's] symptoms and exposure to whatever seems to be causing her difficulty [at the Ben-Hem]" (emphasis supplied).

Doctor David Christiani opined, "The time course of [the plaintiff's] illness and recovery pattern is very typical in my opinion of occupational related asthma and *I have no reason to*

---

[3]There was no live expert medical testimony at the hearing. Besides the plaintiff, the only witness who testified for the plaintiff was an expert on air quality testing. The sole witness for the TRB was the principal of the Ben-Hem.

[4]We do not now refer to the narrative statements of the physicians on the regional medical panel, which are discussed elsewhere.

*doubt* that despite the fact that a single agent may be difficult to identify, this represents an occupational related asthma condition" (emphasis supplied).

Doctor Ronald Dorris observed, "My diagnosis is Asthma and Rhinitis, Occupational, due to or aggravated by employment in the [Ben-Hem]. The causal relationship is based on my examination and the *history provided to me.* My reason for this causal relationship opinion is based on extensive experience with such patients and the accurate ring of [the plaintiff's] history and the sequence of events, with appropriate documentation of [her] symptoms through spirometric testing."[5] (Emphasis supplied.) Doctor Dorris added, *"[The plaintiff's] excellent [i.e., thorough] history supports of [sic] the relation of her symptoms to her work site.* As symptoms and respiratory reactivity worsen they usually spread so that additional locations and exposures cause symptoms. Therefore the *initial history is very important.* Hers clearly incriminates the lowest floor of the [Ben-Hem]. . . . *If [the plaintiff's] history is accepted as reliable, particularly if it is reinforced by similar complaints from other employees,*[6] *then the relationship between [the plaintiff's] symptoms and her exposures [at the Ben-Hem] should be accepted."* (Emphases supplied.)

The record also contained the certificates and narrative reports[7] of the three physicians who comprised the regional medical panel (panel) that considered the plaintiff's claim for accidental disability retirement, as required by G. L. c. 32, § 6(3)(*a*). See *Fairbairn* v. *Contributory Retirement Appeal Bd.,* 54 Mass. App. Ct. 353, 354-357 (2002), for a description of the regional medical panel, the certificate form, and the function it serves. Here, the panel members each answered in the af-

---

[5]This spirometric testing only took place some time after her initial complaints. Other medical records noted the lack of objective testing.

[6]At the hearing before the AM the plaintiff's allegation that other employees had similar complaints was challenged and unsupported except through the testimony of the plaintiff.

[7]Except for the air quality testing report of Universal Engineering, to which the plaintiff objected, all exhibits were admitted without objection by either party. Thus, although we need not consider whether those documents were properly admitted since the issue was not raised at the hearing, *Fioravanti* v. *State Racing Commn.,* 6 Mass. App. Ct. 299, 304 (1978), we conclude for the reasons stated herein that the documents were properly considered.

firmative the three questions on the certificate form regarding, respectively, (1) extent of incapacity, (2) permanency of incapacity, and (3) possibility of causation.[8] Subsequent to the submission of the panel members' reports, the TRB submitted a request for clarification to each of the three physicians pursuant to 840 Code Mass. Regs. § 10.11(2) (1998). See, e.g., *Houde* v. *Contributory Retirement Appeal Bd.*, 57 Mass. App. Ct. 842, 845, 850 n.10 (2003).[9] Among the questions posed to each doctor by the TRB in its request for clarification was the following:

> "Please elaborate on the significance of the results from the engineering air quality study done on both the [plaintiff's] home and work environments. Since viable fungus spores were found in both the home and work environments, can you determine which source contributed primarily to the causation and continuation of the [plaintiff's] condition?"[10]

Each of the three doctors on the panel made statements in their narratives that were helpful to the plaintiff's case. On the other hand those narratives, as supplemented by their clarifications, also contained information that could have tended to weaken the plaintiff's claim. For example, Dr. William Fishbaugh, Jr., noted that despite the plaintiff's move to New

---

[8] The certificates used here posed the following as the third question: "Is said incapacity such as might be the natural and proximate result of the personal injury sustained or hazard undergone on account of which retirement is claimed?" See G. L. c. 32, § 6(3)(a).

[9] A copy of each request was submitted to the medical panel administrator of the Public Employee Retirement Administration Commission (PERAC). The administrator reviewed the clarifications of the panel members and found them to be in order. Letters from PERAC to the attorney for the TRB stated that the TRB was encouraged to review the clarifications and to request further clarifications if necessary, so long as PERAC was given copies.

[10] The dissent, viewing the question posed as one calling for an unqualified opinion on causation, opines that it was improper for the question to have been placed before the panel. However, the key language of the question ("can you determine") does not seek an unqualified opinion on causation-in-fact; rather, it probes the medical thinking that would go into the making of such a determination. In any event, for purposes of deciding whether the clarifications contained unqualified opinions on causation-in-fact that could not be given weight by the AM, in our view the important point of focus is the doctors' responses, not the question that prompted them.

Hampshire her symptoms have not changed or gotten worse, and that she has problems because she had other allergies. He also noted that her mother had asthma. In his clarification, Dr. Fishbaugh stated, "[W]hether [it was] the home environment or the work environment . . . which was the major contributor, it's spores, and it doesn't make any difference if it is at home or at work." Doctor Thomas Morris, III, originally noted that the plaintiff had normal spirometry in January, 1994, and that she had a paradoxically negative response to bronchodilators. In his clarification he noted that he could not determine which source, as between home and work, contributed primarily to the causation and continuation of her problems. He also stated that if she were not in an environment that exposed her to mold spores there was no reason she could not perform the essential duties of her job. (Only the Ben-Hem was shown to have had mold spores, and there was no evidence that other schools in the district had similar problems). In his original narrative Dr. Ronald Sen noted that the plaintiff's nature of presentation was "unusual." He reiterated in his supplement that "her presentation is atypical." He also stated that although her sinus disease "may be a precipitating problem for asthma flares," her previous surgery and sinus disease cannot be presumed to be related to her current condition. Dr. Sen opined that it would be "impossible to determine which sources of exposure contributed proportionally to [the plaintiff's] symptoms." He also noted that the plaintiff's ability to perform her job would depend on her ability to perform in the work place assigned and that there are relatively few work places free of dust and mold.

The information supplied by the medical panel in the certificates, narratives, and clarifications was considered by the AM, and properly so. See *Fairbairn* v. *Contributory Retirement Appeal Bd.*, 54 Mass. App. Ct. at 361-362; *Houde* v. *Contributory Retirement Appeal Bd.*, 57 Mass. App. Ct. at 850 n.10. The ultimate question of causation is for CRAB. The purpose of the third question on the regional medical panel certificate is to inform CRAB whether there is a medical possibility that the events relied upon could cause the disability. The members of the panel are not prohibited from explaining their views and reasons why they reached their conclusions or from providing

information on the medical issues involved. See *Fairbairn* v. *Contributory Retirement Appeal Bd.*, *supra* at 361. This was not a case such as *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. at 254-255, where the panel doctors offered their unqualified opinion on the issue of causation. Rather, the original narratives and subsequent clarifications here contained helpful information and opinion about the medical possibilities, which the AM was entitled to consider along with all the other evidence. See *Fairbairn* v. *Contributory Retirement Appeal Bd.*, *supra*. Information and opinions contained in the narrative statements of the doctors who comprise the regional medical panel, including clarifications, may, except for unqualified opinions as to actual causation, be considered by a retirement board and CRAB on the question of causality. See *ibid.* As *Fairbairn* reminds us, the question of causation is a combination of medical and nonmedical facts. *Id.* at 359, quoting from *Noone* v. *Contributory Retirement Appeal Bd.*, 34 Mass. App. Ct. 756, 762 (1993). The traditional use of the hypothetical question posed to the panel of doctors serves well to preserve this distinction and remind the fact finder that an expert opinion based on assumed facts can only be given weight if the assumed facts are determined to be true. See, e.g., *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 487 n.13 (2000). See also Liacos, Brodin, & Avery, Massachusetts Evidence § 7.7.3 (7th ed. 1999). Furthermore, even aside from reliance on expert opinion testimony under this rubric, a medical panelist may have useful information and learning to impart that will help CRAB reach an intelligent decision on issues of causation. The better the medicine or science is understood, the better a lay decision maker can make an informed judgment on such questions. On the other hand, unqualified expressions of opinion tend to mask the factual premises upon which the opinion is based.

Here, the three doctors on the panel for the most part avoided expressing unqualified opinions on causation, both in their original narratives and in their clarifications. To the extent such opinions slipped into their language, the context gave the necessary qualification. Thus, it was not improper for the AM to

consider the medical uncertainties presented by this evidence in evaluating whether the plaintiff had carried her burden.[11]

*The burden of proof and substantial evidence.* The plaintiff bore the burden of proving causation to CRAB by a preponderance of the evidence. See *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. at 255. On appellate review under G. L. c. 30A, § 14(7), however, we "may not set aside a CRAB decision, not otherwise legally erroneous, that is supported by substantial evidence," *Lisbon* v. *Contributory Retirement Appeal Bd.*, *supra* at 257, by which is meant only " 'such evidence as a reasonable mind might accept as adequate to support a conclusion,' after taking into consideration opposing evidence in the record." *Ibid.*, quoting from G. L. c. 30A, § 1(6). Here, the plaintiff failed to persuade the AM that mold in her work place caused her permanent disability.[12] In the plaintiff's argument on appeal, there is some confusion of analysis revolving around the concept of substantial evidence in the context of fact finding in an administrative adjudicatory hearing. The plaintiff frames the issue by complaining that CRAB's rejection of her claim on causation was not supported by substantial evidence. But it was she who was required to persuade the fact finder that her disability was proximately caused by the environment of her work place.

The plaintiff did provide the fact finder with plenty of

[11]From the case law discussed *supra*, prohibiting the fact finder from giving weight to panelists' unqualified opinions on causation, the dissent seems to extrapolate the principle that opinions on the medical uncertainties of establishing causation are similarly forbidden. We do not perceive support for this principle in the prior cases, and we decline to establish it now.

[12]In her written decision, the AM explained her core reasoning as follows: "In view of the fact that the mold found in the Ben-Hem School was also found in the [plaintiff's] home, and in view of the fact that every clinician who was asked was unable to say whether the [plaintiff's] home or the school caused her condition, and because on the [plaintiff's] last day of work her symptoms flared at the Lilja School where she claimed to be asymptomatic, I must conclude that the [plaintiff] has failed to meet her burden of proof with respect to causation." The AM added, "Although the [plaintiff's] expert testified that the air quality testing performed in 1994 probably under-reported the presence of mold because the testing was performed in the winter, and because the testing method is one that is known to kill mold, there is no other report to use. The Ben-Hem School has since been demolished. Even if one were to speculate that the prevalence of mold in the school was actually higher than that reported, the same would be true of the [plaintiff's] home."

evidence which could have led to a result favorable to her. If the AM had been persuaded and had concluded that the plaintiff had proved her case on the issue of proximate cause, that decision would have been supported by substantial evidence in the record. But the opposing party did not have a burden to prove that the plaintiff's condition was not caused by her work environment and to supply substantial evidence to the fact finder to support such a conclusion.

It is true that, in an adjudicatory hearing, where uncontradicted expert opinion evidence is produced on a subject beyond the common knowledge of the fact finder, there must be a basis in the record for rejecting such evidence or for remaining unpersuaded. See *Robinson* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 634, 639 (1985). See also *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 470 (1981) (board of assessors may not reject unrebutted and corroborated testimony "without a basis for such rejection in the record"). This rule is in place to guard against capricious and arbitrary rulings by an administrative agency. Here, as set forth above, such a basis does exist in the record.

The substantial evidence rule does not get turned on its head and applied equally both to the party that does not have the burden of proof and to the party with the burden of proof. All that is required is that the record contain facts that make rejection of such expert evidence reasonable.

The mere circumstances that a claim of causation is supported by some expert testimony does not require the AM to articulate all the reasons for rejecting that claim. Findings that disclose facts fairly detracting from the plaintiff's case are sufficient to show that the AM was not acting arbitrarily and capriciously even if those facts are not parsed and marshaled by the AM in the most convincing manner. Here, as required, the AM "made subsidiary findings of fact on the relevant issues and explained [her] reasons for rejecting the expert [evidence] based on those subsidiary findings." *Robinson* v. *Contributory Retirement Appeal Bd.*, *supra* at 640.

*The air quality study.* The plaintiff argues that the AM misread the report of Universal Engineering, the environment

expert. Air sampling was conducted at the site of the plaintiff's office at the Ben-Hem and at her home. Mold spores were found in both locations, but in no more than moderate concentrations. For mold spores to be significant, the plaintiff needed to show that the spores to which she was allergic[13] were present at her work place but not in her home. On this point the report stated as follows: "The types of growth identified in the analyses were Penicillium, Aspergillus, Cladosporium, Acremonium, Alternaria, Saprophyte, Epicoccum and Rhizopus. [The plaintiff's] allergy testing indicated reaction to Penicillium, Aspergillus and Cladosporium." This statement can be interpreted to mean that all the listed types of mold were found in all samples taken during the testing. Universal Engineering knew that it was trying to shed light on the problem of whether offending molds could be found in both the plaintiff's work place and her home or whether they were to be found only in her work place. Thus it was not unreasonable to interpret its report as meaning that all listed molds were found in all air samples.[14] Indeed, that is the plain meaning of the language used.

In the alternative, the report could arguably be read to be no more than a list of all the various types of mold found at least once in a sample. This is the position argued by the plaintiff and by the dissent. The plaintiff argues that Universal Engineering must have had the data identifying the mold spores found in each sample and could have reported that information. But it is by no means obvious that the listed types of mold do not appear commonly together in any area where any mold is to be found. The AM was entitled to reject the alternative interpretation urged by the plaintiff. The plaintiff, however, maintains that the TRB had the burden to show that the offending mold was in

---

[13]Penicillium, Aspergillus, and Cladosporium.

[14]The report also states that certain visible green mold on a floor and shower head at the Ben-Hem work place was analyzed and found to contain a type of mold to which the plaintiff was not allergic. The plaintiff criticizes this aspect of the report on the ground that it does not state that the mold mentioned was the only mold found. This was similarly a matter of reasonable interpretation of the report. Furthermore there is no discussion in the evidence about the significance of mold in a solid or viscous form to the presence of airborne mold spores.

both her home and her work place. We decline to adopt this proposition.[15]

*Judgment affirmed.*


MILLS, J. (dissenting). The plaintiff, Nancy Narducci, appeals from a Superior Court judgment affirming a ruling against her by the Contributory Retirement Appeal Board (CRAB). She primarily argues that CRAB's decision is unsupported by substantial evidence. I agree, and would reverse.

The facts marshaled by the judge are summarized briefly. Narducci worked as a music teacher for the Natick public schools from 1980 to January 18, 1994, when she stopped working because of acute bronchitis and asthma. She had worked on Mondays, Wednesdays, and Fridays at the Bennett-Hemenway School ("the Ben-Hem"), and on Tuesdays and Thursdays at the Lilja School. In September, 1993, principally because of a shortage of classroom space, her desk was relocated to the basement of the Ben-Hem. She ultimately was situated in an abandoned locker room then being used for storage.

Narducci had a history of recurring respiratory difficulties dating back to February, 1989, when she developed sinusitis after surgery for a deviated septum. Beginning in September, 1993, she began to experience headaches and head congestion on days when she worked at the Ben-Hem. These symptoms did not occur, however, on days she worked at the Lilja School or remained at home. From November 12, 1993, to January 3, 1994, she was out sick with viral bronchitis. On November 30, 1993, she wrote to the principal of the Ben-Hem and informed him that she believed her bronchitis to have been the result of an allergic reaction triggered by poor air quality at the Ben-Hem. She asked that the school be tested for "*all* possible pollutants such as mold, fungus, chemicals or asbestos."

On December 21, 1993, Narducci was evaluated by Dr.

---

[15]We find no merit to the plaintiff's contention that the AM committed an error of law by requiring proof of an "unusually traumatic event" — i.e., that the plaintiff was injured by a "traumatic release of contamination." The AM required no such proof.

Michael Lawrence. She reported that her sinus headache and rhinitis had abated since she had been away from the Ben-Hem, but she also reported a new onset of chest congestion, shortness of breath, and wheezing. After returning to work on January 3, 1994, Narducci reported a reoccurrence of her original symptoms within an hour of entering the Ben-Hem. She consulted Dr. Andrew Davidson on January 6, 1994. He suspected occupationally-induced asthma from mold at the Ben-Hem.

From February 2, 1994, to February 18, 1994, the Universal Engineering Corporation (Universal) conducted an indoor air quality study (IAQS) at the Ben-Hem and Lilja Schools as well as at Narducci's residence. The tests identified "very light growth" of mold at the Lilja School, where growth concentrations ranged from 0 to 22 $CFU/m^3$ (colony forming units per cubic meter). It also indicated "light growth" of mold at the Ben-Hem (from 0 to 144 $CFU/m^3$) and in Narducci's home (from 0 to 120 $CFU/m^3$). The report did not, however, reveal what kinds of mold were present in each individual location. See note 1, *infra*.

Narducci attempted a return to work, at the Lilja School, on March 1, 1994. By noon, however, she reported severe shortness of breath, wheezing, chest pains, dizziness, and cough. She was unable to complete the workday and never thereafter returned to teaching.

Narducci filed an application for accidental disability retirement benefits on December 7, 1995. She ultimately claimed occupational asthma and multiple chemical sensitivity resulting from exposure to irritants at the Ben-Hem. The Teachers' Retirement Board (board) denied her application on May 31, 2002, on the ground that she had not demonstrated that work conditions had caused her disability. The board's decision relied substantially upon Universal's IAQS report, which ostensibly proved no statistically significant difference between the mold at the Ben-Hem and that in Narducci's home. Narducci challenged the board's decision before an administrative magistrate of the Division of Administrative Law Appeals (DALA), who held an evidentiary hearing and, on November 18, 2003, affirmed the board's ruling. Narducci appealed to CRAB.

CRAB, on February 23, 2004, adopted as its own the findings and decision of the DALA magistrate. Thus CRAB affirmed the decision of the board denying Narducci's application for accidental disability retirement benefits, derivatively finding that Narducci had failed to carry her burden of proof with regard to causation. The magistrate's conclusion was premised on four findings: (1) "that the mold found in the Ben-Hem School was also found in [Narducci's] home"; (2) "that every clinician [on the regional medical panel] was unable to say whether [Narducci's] home or the school caused her condition"; (3) that "on [Narducci's] last day of work her symptoms flared at the Lilja School where she claimed to be asymptomatic"; and (4) that "[t]he one mold found in the Ben-Hem basement that appeared as green slime on the shower and showerhead was [F]usarium mold, to which [Narducci] was not sensitive, by allergy scratch test."[1] CRAB, through the administrative magistrate, also speculated that Narducci's asthma could have been "idiopathic" or caused by "the viral bronchitis that preceded [its] onset." The Superior Court judge referred exclusively to these findings in his decision, as well, and, based upon them, denied Narducci's challenge to CRAB's ruling.

---

[1]The fourth finding is misleadingly phrased insofar as it suggests that only a single variety of mold was detected in the Ben-Hem basement. The record neither supports nor refutes such an assertion, because the IAQS report indicates the discovery of Penicillium, Aspergillus, Cladosporium, Acremonium, Alternaria, Saprophyte, Epicoccum, and Rhizopus growths. (As will be discussed in more detail, the IAQS report fails to specify which growths were found, and in what concentrations, at each of the various testing sites.)

Furthermore, while a preliminary report of the outcome of the IAQS states that "green colored material . . . found on the floor and shower head" in Narducci's office was "analyzed and found to contain heavy growth of Fusarium species [*sic*]," the final report makes no such taxonomic identification, and instead refers only to "green colored material . . . found on the floor and shower head." Even assuming that this green substance "contain[ed] heavy growth of Fusarium," it remains unclear whether it consisted entirely or only partially of that particular genus of mold. Also somewhat remarkable is that the preliminary IAQS report indicates that "Mrs. Narducci's allergy testing included testing for Fusarium and she was found to have no reaction to this species [*sic*]." Similarly, the final report noted that Narducci's allergy testing indicated reactions to the Penicillium, Aspergillus, and Cladosporium genera. I simply note that, in a scientific study, one would expect the professional performing the IAQS to do so blindly, without advance knowledge of the test subject's particular allergies.

In my view, reliance on the medical panel's inability or unwillingness to issue a positive finding as to actual causation was improper as matter of law and should by itself entitle Narducci to a new hearing. No such hearing is necessary in this case, however, because the record contains no substantial evidence either to support CRAB's decision or to undermine Narducci's prima facie case. Narducci's application for accidental disability retirement benefits should therefore, in my opinion, be approved.

1. *The prima facie case.* The record compels a positive finding on causation and it would be unfair to remand. The magistrate made no finding as to the credibility of Narducci's medical experts and their opinions of causation. See *Robinson v. Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 634, 638 (1985). The issue of causation is "a matter beyond the common knowledge and experience of the hearing officer (and CRAB), and expert testimony was required to guide [her]." *Id.* at 639. "The probative value of the expert testimony is for the fact-finding tribunal to decide, and where there is conflicting expert testimony, the fact finder may completely discount the testimony of one expert and rely exclusively on the other." *Ibid.* "However, where, as here, there is uncontradicted testimony concerning a subject which is beyond the common knowledge and experience of the finder of fact, that testimony may not be rejected without a basis for such rejection in the record." *Ibid.* "Moreover, in keeping with the requirements of G. L. c. 30A, § 11(8), the fact-finding agency must make subsidiary findings of fact on the relevant issues and explain its reasons for rejecting the expert testimony based on those subsidiary findings." *Id.* at 640.

In this case the magistrate stated reasons for her decision and I have determined those reasons to be erroneous. She stated no lawful reasons, then, for rejecting Narducci's uncontradicted medical evidence. In this case the medical opinions are many and substantial. This is not a case where there is even a hint of quackery, despite mention by some of the experts that the plaintiff's self-reporting was important in the diagnoses and

opinions.[2] Narducci has substantiated her claim as to causation with documented expert opinions from no fewer than four medical doctors — each one a respiratory specialist. Significantly, the independent medical examiner retained by the Board of Industrial Accidents, Dr. Ronald Dorris, was among these physicians. The relevant testimony of these medical professionals is summarized in the margin.[3]

---

[2]My view should not be construed as prohibiting any fact finder, in the appropriate case, from rejecting the expert testimony by a credibility determination. However, in such a case, the fact finder must say so. See *Robinson* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. at 640 & n.5.

[3]As a preliminary matter, I note that "an employee may recover even when [her] injury is due in part to [her] own weakness or vulnerability; the employer must take [the] employee 'as is.' . . . If a condition . . . of work aggravates a preexisting health problem, the employee has suffered a 'personal injury,' and may recover from the employer for [the] entire disability, without apportionment," *Zerofski's Case*, 385 Mass. 590, 593 (1982), so long as the working condition is "identifiable . . . [and] not common and necessary to all or a great many occupations." *Id.* at 595. See *Adams* v. *Contributory Retirement Appeal Bd.*, 414 Mass. 360, 365 (1993).

Doctor Andrew Davidson: "In my opinion, it is most likely that [Narducci's] disabilities are directly caused by her exposures to fungus and poor ventilation in the work place." "I suspect that Mr. and Mrs. Narducci are correct in their presumed diagnosis of occupationally induced asthma from molds in the school building . . . ." "It is still my belief that this patient is suffering from occupational asthma as a cause of her symptoms."

Doctor Michael Lawrence: "Now that we have confirmed the diagnosis of asthma with a positive Methacholine Challenge, I do feel that there is a defin[i]te relationship between exacerbation of her symptoms and exposure to whatever seems to be causing her difficulty [at the Ben-Hem]. . . . I have suggested that [Narducci] not return to work because of exacerbation of her symptoms . . . ."

Doctor David Christiani: "The time course of [Narducci's] illness and recovery pattern is very typical in my opinion of occupational related asthma and I have no reason to doubt that despite the fact that a single agent may be difficult to identify, this represents an occupational related asthma condition." "Clearly, indoor air quality problems at [the Ben-Hem] substantially aggravated and accelerated [Narducci's] condition." "I . . . believe that the [Ben-Hem] was a substantial, i.e. major cause of [Narducci's] current disability." See *May's Case*, 67 Mass. App. Ct. 209, 210-213 (2006) (in order to be deemed predominant contributing cause under workers' compensation act, given cause need not be greater than sum of all other causes).

Doctor Ronald Dorris: "My diagnosis is Asthma and Rhinitis, Occupational, due to or aggravated by employment in the [Ben-Hem]. The causal relationship is based on my examination and the history provided to me. My reason for this causal relationship opinion is based on extensive experience with such

Apparently even the doctor secured by Narducci's employer was unwilling to directly contradict his colleagues' opinion as to causation.[4] It is more than evident that the medical testimony in this record fairly detracts from the weight of the surviving evidence relied upon by CRAB, as it in fact compels a positive finding as to causation. See *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966); *Robinson* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. at 639.

2. *Certification by the regional medical panel.* Among the prerequisites for the board to grant accidental disability retirement is written certification from a regional medical panel that the applicant "is mentally or physically incapacitated for further duty" and that the incapacity is "likely to be permanent" and "such as might be the natural and proximate result of the accident or hazard undergone on account of which such retirement is claimed." G. L. c. 32, § 6(3)(*a*), as amended by St. 1946, c. 603, § 2. See G. L. c. 32, § 7(1). The certification required is of the *medical plausibility* that the incapacity *could* be the natural and proximate result of work place conditions. Panelists are neither required nor intended to certify the ultimate fact of causal connection. "The statute, in apt language ('might be the . . . result'), makes a significant distinction from the requirement of an unqualified certification . . . ." *Kelley* v. *Contributory Retirement Appeal Bd.*, 341 Mass. 611, 614 (1961). Accordingly, a medical certificate that states only that work place

patients and the accurate ring of [Narducci's] history and the sequence of events, with appropriate documentation of [Narducci's] symptoms through spirometric testing." "[Narducci's] excellent [i.e., thorough] history supports of [*sic*] the relation of her symptoms to her work site. As symptoms and respiratory reactivity worsen they usually spread so that additional locations and exposures cause symptoms. Therefore the initial history is very important. [Narducci's initial history] clearly incriminates the lowest floor of the [Ben-Hem]. . . . If [Narducci's] history is accepted as reliable, particularly if it is reinforced by similar complaints from other employees, then the relationship between [Narducci's] symptoms and her exposures [at the Ben-Hem] should be accepted."

[4]Doctor John Davis, who examined Narducci on behalf of the town of Natick, stated: "It is my interpretation of the multiple physicians who have supported Ms. Narducci's permanent disability from gainful employment, that the basis of their [diagnosis of] disability is in large part based on [Narducci's] ongoing self reporting of respiratory symptoms." I have found no authority to suggest that self-reporting of symptoms is contrary to law or good medicine.

conditions did not cause the disability in question is deficient, as the panel has failed to perform its statutory charge of stating whether or not it is medically possible that the type of disability identified could result from the type of injury sustained or hazard undergone. See *id.* at 616; *Noone* v. *Contributory Retirement Appeal Bd.*, 34 Mass. App. Ct. 756, 761-762 (1993).

The second of CRAB's adopted findings, relying as it did upon the panel's views with regard to cause-in-fact, was improper as matter of law.[5] "The panel has no statutory authority to express an unqualified negative opinion as to causation, and such an opinion, if expressed, is a nullity." *Id.* at 762. See *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. 246, 254-255 (1996) (extending prohibition to unqualified positive opinions as to causation); *Fairbairn* v. *Contributory Retirement Appeal Bd.*, 54 Mass. App. Ct. 353, 359 (2002). The medical panel is assembled to "determin[e] the preliminary medical question which would normally be beyond the competence of the local board," and its participation beyond that point is an incursion upon the role of the fact finder itself. *Malden Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 1 Mass. App. Ct. 420, 424 (1973). Statements from the panel relating to cause-in-fact are "extraneous . . . and . . . at best . . . gratuitous." *Wakefield Contributory Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 352 Mass. 499, 503 (1967).

[5]Formerly, when a certificate acknowledged the medical plausibility of causation and then went on to state the panel's own views as to cause-in-fact, the panel's assessment, whether adverse to the claimant or favorable, properly came before the board "in the nature of evidence." *Kelley* v. *Contributory Retirement Appeal Bd.*, 341 Mass. at 616. See *Cassier* v. *Contributory Retirement Appeal Bd.*, 332 Mass. 237, 239 (1955); *Shrewsbury Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 5 Mass. App. Ct. 379, 381 (1977). In general, this practice is no longer supported by Massachusetts case law. An exception is the distinction sometimes drawn between affirmative and negative "certifications" of actual cause. An affirmative certificate from the medical panel as to cause-in-fact may sometimes be taken by the board as "some evidence" on the issue of actual cause. See *Blanchette* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 479, 483 (1985); *Noone* v. *Contributory Retirement Appeal Bd.*, 34 Mass. App. Ct. at 763 n.12; *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. 246, 254 (1996). However, this practice is also eroding. Compare *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. at 254-255.

See *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. at 255.

In Narducci's case, the opinions of the medical panelists with regard to cause-in-fact were solicited by counsel for the board by way of an interrogatory, which read:

> "Please elaborate on the significance of the results from the engineering air quality study [i.e., the IAQS] done on both [Narducci's] home and work environments. Since viable fungus spores were found in both the home and work environments, can you determine which source contributed primarily to the causation and continuation of [Narducci's] condition?"

The doctors' responses are set out in the margin.[6] Although it is true that none of the three doctors was able to state conclusively that the mold at the Ben-Hem caused (or primarily caused) Narducci's disability, it was highly improper for the question to have been placed before the panel in the first place. The language of the statute was crafted so as to avoid exactly this result. See *Kelley* v. *Contributory Retirement Appeal Bd.*, 341 Mass. at 614. Moreover, if the panel lacks the statutory authority to express on its own initiative a positive or negative opinion as to cause-in-fact, then, a fortiori, an inconclusive finding by the panel rendered at the request of one of the litigants can be accorded no evidentiary weight by the board or CRAB. See *Noone* v. *Contributory Retirement Appeal Bd.*, 34 Mass. App. Ct. at 762; *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. at 254-255; *Fairbairn* v. *Contributory Retirement Appeal Bd.*, 54 Mass. App. Ct. at 359. "The medical panel . . . is not charged with the duty to provide statements of any evidence. Its function is fully performed by making a certification . . . ." *Mathewson* v. *Contributory Retirement Appeal Bd.*,

---

[6]Doctor William Fishbaugh, Jr., responded: "[W]hether the home environment or the work environment . . . was the major contributor, it's spores, and it doesn't make any difference if it is at home or at work. It was found that there were spores in [Narducci's] work environment."

Doctor Thomas Morris, III, responded: "I am unable to elaborate on the significance of the results of the engineering air quality studies beyond what is in the reports themselves. I cannot determine which source contributed primarily to the causation and continuation of [Narducci's] condition."

Doctor Ronald Sen responded: "It is impossible to determine which sources of exposure contributed proportionally to [Narducci's] symptoms."

335 Mass. 610, 615 (1957). See *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. at 255 (judge's approbation of magistrate's dependence upon ultra vires medical panel views was derivatively inappropriate).

It was error for CRAB to accept as evidence against Narducci the medical panel's uncertainty[7] as to causation-in-fact. The prejudicial effect of this error was likely extreme, since this improper evidence appears to have been the primary basis for CRAB's ruling. Accordingly, I next look to the record to determine whether the appropriate remedy is remanding the matter for a new hearing or entering an order that Narducci's application for accidental disability retirement be approved. See G. L. c. 30A, §§ 1(6), 14(7).

3. *Substantial evidence test.* Here, the first inquiry is whether the record contains substantial evidence to sustain CRAB's finding "that the [pathogenic] mold found in the Ben-Hem School was also found in [Narducci's] home." I conclude that it does not, notwithstanding an appreciation of the rule that an agency decision, in order to be supported by substantial evidence, "need not be based upon the 'clear weight' of the evidence . . . or even a preponderance of the evidence, but rather only upon 'reasonable evidence,' . . . i.e., 'such evidence as a reasonable mind might accept as adequate to support a conclusion,' after taking into consideration opposing evidence in the record." *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. at 257 (citations omitted). See G. L. c. 30A, §§ 1(6), 14(7).

A strongly deferential standard of review applies to appeals brought under G. L. c. 30A, and the court is "not empowered to make a de novo determination of the facts, to make different credibility choices, or to draw different inferences from the facts found" by CRAB. *Pyramid Co. of Hadley* v. *Architectural Barriers Bd.*, 403 Mass. 126, 130 (1988). Likewise, "[i]f the agency has, in the discretionary exercise of its expertise, made a 'choice between two fairly conflicting views,' and its selection

[7]Because the board's interrogatory erroneously presumed the legitimacy of the IAQS report, and incorporated that report by reference in its question, the uncertainty of the medical panelists was virtually guaranteed. The IAQS report will be discussed in more detail.

reflects reasonable evidence, '[a] court may not displace [the agency's] choice . . . even though the court would justifiably have made a different choice had the matter been before it de novo.' " *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. at 257, quoting from *Southern Worcester County Regional Vocational Sch. Dist.* v. *Labor Relations Commn.*, 386 Mass. 414, 420 (1982). Nonetheless, the court's approach must be "one of judicial deference and restraint, but not abdication." *Arnone* v. *Commissioner of the Dept. of Social Servs.*, 43 Mass. App. Ct. 33, 34 (1997). The circumstances of this case compel a reversal of CRAB's decision because it was not based on substantial evidence. See G. L. c. 30A, § 14(7)(*e*).

a. *The air quality report.* The IAQS report[8] is the only record evidence that might have supported the critical finding that the growths harmful to Narducci were present at both the Ben-Hem and her residence. However, the report is fundamentally flawed and provides no support for this finding. Here it is emphasized that I am not reappraising the evidence in the record or drawing inferences other than those made by CRAB. Rather, I conclude that, as matter of law, the nature of the report is such that it can support no inference whatsoever with regard to which substances were present, and in what concentrations, at any given location.[9] The report, in other words, neither sustains nor refutes CRAB's finding. As such, it cannot be said to provide the requisite "substantial evidence" in support of CRAB's decision. See G. L. c. 30A, § 1(6).

The report is of no evidentiary value with regard to the location, identity, and concentration of growths for the plain reason

---

[8]These documents, hereinafter referred to collectively as the "report," consist of a preliminary summary report and a final report.

[9]I note, but do not rely upon, the uncontradicted expert testimony placed before CRAB by Narducci. Certified industrial hygienist Thomas Hamilton testified that (1) the IAQS procedure followed by Universal had been largely abandoned by the industry by the time the test was conducted in 1994; (2) the "more standard" Anderson N6 test was available no later than 1986; (3) the selected IAQS procedure was found to kill specimens during the testing process and thus could grossly underestimate spore counts; and (4) the selected IAQS procedure only tested for viable (live) spores despite the fact that dead spores are also potentially pathogenic. I will assume, arguendo, that the reported counts accurately reflect the number of spores present in each location.

that it does not state, for each discrete location,[10] what growths were present and in what concentration. While the report does contain a listing of the growths that were found in at least one of the three locations, the list is aggregated and undifferentiated.[11] See note 1, *supra.* The fact finder is given no indication — and has no scientific basis for inferring — which growths were discovered in each individual location. Since Narducci was sensitive to some of the listed growths but not to others, it is self-evident that the report's failure to specify which growths were found in each distinct location renders the report useless with regard to whether offending mold was present both at the Ben-Hem and in Narducci's home. Relatedly, I observe that all concentrations listed in the laboratory report are labeled only "FUNGI/MOLD VIABLE SPORES." Inexplicably, the stated spore concentrations are merely sums, the component parts of which (i.e., the individual concentrations of each distinct type of growth identified) are nowhere reported. An undifferentiated and haphazard listing of all the growths found in all the locations provides no basis for any kind of inference as to which growths were found in each specific location, let alone the concentrations in which each growth occurred.[12]

The report is of no evidentiary value to the conclusion for which CRAB invoked it. Compare *Commonwealth* v. *Johnson,* 59 Mass. App. Ct. 164, 169 (2003) (record of drug test results inadmissible, in trial for operating motor vehicle while intoxicated, as vagueness of record would leave jury to speculate what concentration of drug was present in defendant's system); *Commonwealth* v. *Shellenberger,* 64 Mass. App. Ct. 70, 76 (2005) (improper to admit evidence of amphetamines in de-

---

[10]The Ben-Hem, the Lilja School, and Narducci's residence were the three buildings tested.

[11]The board emphasizes the testimony of Narducci's own expert witness that the genera of molds to which she proved sensitive (Penicillium, Aspergillus, and Cladosporium) are "the most common molds" and tend to be present "in nearly every sample we collect." A substantial caveat has been omitted by the board: that there are individual species of molds in these three genera which are not common and are sometimes pathogenic.

[12]Separately, I note the obvious fact that the report does not provide any grounds for an inference that only the growths identified in the report were present at any or all of the testing sites. At most, one can exclude only those growths actually tested for and found to be absent.

fendant's system without "reliable evidence" as to concentration of drug). Because the record contains no other source purporting to identify what growths were present in Narducci's home, it is clear that no substantial evidence exists to justify CRAB's finding that the offending mold was present both at the Ben-Hem and in Narducci's residence.

b. *The Lilja School "flare-up" and the shower head green mold.* Having eliminated from consideration both the uncertainty of the medical panel with regard to cause-in-fact and the IAQS report from Universal, I now examine the remainder of the record, and the administrative magistrate's remaining two findings, to assess whether they provide a substantial basis for CRAB's negative finding as to causation. The only other evidence cited by the magistrate and adopted by CRAB is (1) that on Narducci's last day of work, her symptoms flared up at the Lilja School, a location where she had claimed to be asymptomatic, and (2) that the "green slime" found in Narducci's office was Fusarium mold, to which Narducci was not sensitive. These findings are coupled with speculation that Narducci's asthma could have been "idiopathic" or caused by an earlier bout of viral bronchitis. This is not strong evidence. The incident at the Lilja School is not relevant to the issue of causation, but instead merely speaks to the presence of a medical condition or disability in general. The "flare-up" at the Lilja School was an isolated incident, quite unlike the documented and medically supported reports of systematic respiratory problems closely correlated over an extended period of time with Narducci's presence at the Ben-Hem.

With regard to the discovery of purportedly innocuous Fusarium mold at the Ben-Hem, it is sufficient to state, as noted above, see note 1, *supra,* that the affirmative presence of one growth cannot be taken as evidence that no other growths are present. Speculation that Narducci's symptoms were "idiopathic" or caused by viral bronchitis is not appropriate when the record contains uncontroverted expert medical testimony to the contrary. See *Robinson* v. *Contributory Retirement Appeal Bd.,* 20 Mass. App. Ct. at 639 ("where . . . there is uncontradicted testimony concerning a subject which is beyond the common knowledge and experience of the finder of fact, that testimony may not be

rejected without a basis for such rejection in the record").

To establish substantial evidence, it is not enough merely to demonstrate that the record contains "some evidence . . . from which a rational mind might draw the [same] inference" as did the administrative agency. *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 253 (1966). "[The] determination must be made 'upon consideration of the entire record.' " *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981), quoting from *Cohen* v. *Board of Registration in Pharmacy, supra.* That is, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Cohen* v. *Board of Registration in Pharmacy, supra,* quoting from *Universal Camera Corp.* v. *National Labor Relations Bd.*, 340 U.S. 474, 488 (1951). I conclude that there is not substantial evidence in the record to support CRAB's decision.

It was error for the board to deny Narducci's claim for accidental disability retirement benefits. The record contains no evidence contesting the medical panel's unanimous certification that Narducci is physically no longer capable of performing the essential duties of a music teacher and that this incapacity is likely to be permanent.[13] Accordingly, in light of my positive conclusions as to causation, I would hold that Narducci is entitled to accidental disability retirement benefits.[14] The judgment should be reversed and a new judgment should enter reversing the decision of CRAB and directing that Narducci's application be approved.

---

[13] Doctor Davis (see note 4, *supra*) reported that he was "unable to document any specific organic disease of the respiratory tract at this time that would account for [Narducci] being considered as totally disabled from gainful employment." For present purposes, it is not relevant whether Narducci is disabled from *all* gainful employment. The proper inquiry is instead whether she is disabled in such a way as to preclude further service as a music teacher. See *Quincy Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 340 Mass. 56, 60 (1959) ("the incapacity referred to is the substantial inability of an applicant to perform the duties of [her] particular job or work of a similar nature or for which [her] training and qualifications fit [her]").

[14] In my view there would be no need for consideration of Narducci's additional claim that CRAB committed an error of law by effectively requiring proof of an "unusually traumatic event."