842        57 Mass. App. Ct. 842 (2003)

Houde v. Contributory Retirement Appeal Board.

PATRICIA HOUDE vs. CONTRIBUTORY RETIREMENT APPEAL
BOARD & another[1] (and a companion case[2]).

Nos. 01-P-256 & 01-P-257.

Middlesex. October 7, 2002. - April 25, 2003.

Present: LENK, BERRY, & McHUGH, JJ.

*Public Employment,* Accidental disability retirement. *Contributory Retirement
Appeal Board. Administrative Law,* Substantial evidence.

The record of proceedings in which employees of a city were denied ac-
cidental disability retirement benefits after their examination by medical
panels provided by a company often used by the Public Employee Retire-
ment Administration Commission for such services did not support the
employees' claims of financial bias on the part of the medical panels
where, although the city often used the company to provide the medical
panels and the employees claimed that the city's retirement board
recognized the company's bias, the governing statutes, G. L. c. 32, § 7(1),
and G. L. c. 32, § 6(3)(a), embodied the Legislature's chosen method for
dealing with the potentially pernicious effect of financial bias, and did not
prohibit examination of the employees by the medical panels provided by
the company in question. [845-848]

Claims by an employee of a city, who was denied accidental disability retire-
ment benefits after examination by a medical panel, that the form each
panel member used to transmit his findings to the board asked the wrong
question, and that one of the panel members reached his conclusion that
the employee was not disabled by comparing her physical abilities with
her written job description, either were of no consequence with regard to
the question asked or, when considered with other comments by the panel
member, permitted a finding that the panel member's conclusion was based
on the work the employee actually performed and not on a purely theoreti-
cal job description. [848-849]

This court rejected a claim by an employee of a city, who was denied ac-
cidental disability retirement benefits after examination by a medical panel,
that one of the panel members used an impermissible causation standard,
where substantial evidence supported the conclusion of an administrative
magistrate that the panel member had used the proper standard. [849-851]

CIVIL ACTIONS commenced in the Superior Court Department
on November 5, 1998, and February 23, 2000, respectively.

---

[1]Cambridge Retirement Board.

[2]John Minavich vs. Contributory Retirement Appeal Board & another.

The cases were heard by *Ernest B. Murphy*, J., on motions for judgment on the pleadings.

*Thomas F. Gibson* for Patricia Houde & another.

*Romeo G. Camba*, Assistant Attorney General, for Contributory Retirement Appeal Board.

*James H. Quirk, Jr.*, for Cambridge Retirement Board.

McHugh, J. Patricia Houde and John Minavich were injured while employed by the city of Cambridge. Their applications for accidental disability retirement benefits were denied first by the Cambridge Retirement Board (board) and then by the Contributory Retirement Appeal Board (CRAB). They appealed the latter denial to the Superior Court where, after a hearing, judgment entered affirming the CRAB decisions. Now they have appealed to this court claiming financial bias on the part of medical panels that examined them in connection with their applications. They also claim that the medical panels used the wrong standards when evaluating their disabilities. We affirm.

## I. *The Factual Setting.*

A. *Houde.* Houde was employed as a licensed practical nurse at a nursing home the city operated. While at work in December, 1994, she injured her right knee as she was pushing a medical cart. Her knee was surgically repaired the following month.

In June, 1995, the city, which was providing Houde with workers' compensation benefits, had her examined by Dr. James Gibbons, an orthopedic surgeon, who certified that she was fit and able to return to full duty. She returned to work on July 3, 1995, but left during the day upon feeling knee pain. On July 14, 1995, while at home, her knee gave way, causing her to fall, and she remained out of work for the rest of that month. At the end of the month, again at the city's instance, Dr. Gibbons examined Houde and again certified that she was fit to return to work. Magnetic resonance image (MRI) studies completed in August, however, revealed tears in her knee's medial and lateral menisci.[3]

---

[3]Upon learning the results of the MRI studies, Houde filed a complaint against Dr. Gibbons with the Board of Registration in Medicine. She also requested that the city assign no further evaluations of her to Northeast Medi-

About one year later, Houde underwent further knee surgery. Pain nevertheless persisted and ultimately her personal physician opined that she was totally disabled from performing her duties as a nurse. In January of 1997, Houde filed with the board a claim for accidental disability retirement benefits pursuant to G. L. c. 32, § 7. As required by G. L. c. 32, § 6(3)(*a*), the board requested that the Public Employee Retirement Administration Commission (PERAC) appoint a three-member medical panel to examine Houde in connection with her application. As was its frequent practice, PERAC asked a company known as Northeast Medical Evaluations (NME) to provide the panel. NME obliged.

Each panel member subsequently examined Houde. Two of the panelists concluded that she was not disabled and could return to work. The third concluded that she was disabled and that her disability was causally related to her work for the city. After reviewing the divided panel opinion, the board denied Houde's application. She appealed the denial to CRAB, which sent it to the division of administrative law appeals for a hearing. See G. L. c. 32, § 16(4). After the hearing, an administrative magistrate upheld the board's denial. Following Houde's appeal from that decision, see *ibid.*, CRAB did likewise. Houde then took an appeal to the Superior Court pursuant to G. L. c. 30A where, as noted, she met with the same result.

B. *Minavich.* Minavich worked for the city as a laborer and equipment operator. On July 26, 1993, while on the job, he twisted his left ankle when he stepped in a hole. He continued working for a while but, in August, heeding his physician's advice that he rest his foot and ankle, he left work, rested, and received treatment until October, 1993. Minavich never returned to work. Instead, in late 1995 or early 1996, he filed with the board a claim for accidental disability retirement.

Again, the board requested PERAC to supply a medical panel, and again PERAC reached out to NME. NME assembled a panel, each of whose members examined Minavich individually.

cal Evaluations (NME), an organization the city had engaged to perform medical evaluations in connection with workers' compensation and other accidental disability claims. NME had arranged for Houde's examination by Dr. Gibbons. See discussion, *infra* at 845-848.

One of the three, the same Dr. Gibbons who had examined Houde for workers' compensation purposes, opined that Minavich was not disabled and that his symptoms were not causally related to the July 26 incident.[4] Dr. Albert Little, another panel member, concluded that Minavich was disabled but that there was no causal relation between the disability and the accident. The third panelist concluded that Minavich was disabled and that the accident caused the disability.

The board denied Minavich's application after it received and reviewed the panel's report as well as responses to requests for clarification it had addressed to Doctors Gibbons and Little. Minavich's subsequent appeals to CRAB, following a hearing before the same administrative magistrate who heard Houde's case, and to the Superior Court failed to produce a different result.

## II. *The Claims.*

A. *Claims regarding financial bias.* Minavich and Houde first claim that the panel physicians were financially biased because they were employed by NME and, thus, that their reports did not provide an appropriate basis either for the board's denial of their applications or for the decisions that followed. Their bias claims arise out of two primary features of the relationship between NME and the city. First, the city utilizes NME to perform examinations in connection with workers' compensation proceedings under G. L. c. 152 and in connection with police and firefighter disability claims filed under G. L. c. 41, § 111F. During the forty-one month period between May 28, 1994, and October 31, 1997, NME conducted 309 such examinations, or approximately seven and one-half each month, for which it was paid $99,778.80, or approximately $320 per examination. Houde and Minavich claim that that volume of work for the city necessarily means that NME has an interest in continuing to receive city work, an interest that would lead it to skew its examination results in the city's favor.

---

[4]Dr. Gibbons examined Minavich before Minavich had a stroke that left him with some residual weakness in his right upper and lower extremities. The other two physicians examined him after the stroke. Nothing turns on the timing of the examinations.

Secondly, Houde and Minavich claim that the board itself has recognized NME's bias. Evidence of that recognition, they claim, can be found in letters the board sent to PERAC in May, 1997, in connection with accidental disability retirement applications two other city workers had filed. In the letters, the board told PERAC that NME generally performed medical examinations for the city in connection with proceedings under G. L. c. 152 and G. L. c. 41. The board also told PERAC that an NME-related physician had examined both workers for the city in connection with their workers' compensation claims. As a consequence, the board asked PERAC not to appoint any NME-affiliated physicians to examine the workers in connection with their claims for accidental disability retirement. PERAC, for reasons that parallel our own approach, declined to honor the board's request.

On this record, we are not persuaded by the bias claim. Our rejection of that claim stems not from an exercise of our independent judgment regarding permissible entanglements between the city and disability examiners but from our conclusion that the governing statutes embody the Legislature's chosen method for dealing with the potentially pernicious effect of financial bias.

Under G. L. c. 32, § 7(1), an individual who seeks accidental disability retirement files with the board a written retirement application. The board then is required to consider such evidence pertaining to the application as it deems appropriate but must include in that evidence the results of an examination by a "regional medical panel" assembled in the manner described in G. L. c. 32, § 6(3). In addition, the board may not allow an application for accidental disability retirement unless a majority of the physicians of the panel certifies that the applicant is unable to perform the essential duties of his or her job.

General Laws c. 32, § 6(3)(a), as noted, provides that PERAC is to appoint the medical panels. The panels themselves are to be composed of three physicians drawn "from a pool of physicians developed after consultation with representatives of the Massachusetts Medical Society and the department of public health." No physician who previously examined the applicant may serve as a panel member unless the prior examination was

carried out as part of the panel's work or the work of a different panel with the same charge. Moreover, and of greatest relevance to the question of financial bias, none of the three may be an "associated physician," a term § 6(3)(a) defines to mean

> "a physician providing services under [§ 6(3)] who, has a direct and substantial financial interest unrelated to his service [on the panel] . . . in such a manner and to such an extent as to make it unlikely that the physician would be able to exercise independent judgment in providing such services; provided, however, that a physician providing said services through a disability review organization[5] shall not be considered an associated physician [if] the physician has no direct and substantial financial interest in the profit and loss of said organization in such a manner and to such an extent as to make it unlikely that the physician would be able to exercise independent judgment."

Nothing in the record suggests that any of the physicians who examined Houde or Minavich had the kind of financial interest that would trigger a factual inquiry into whether they were "associated" and, thus, disqualified physicians. None, for example, were shown to be an officer, director, or shareholder of NME. The record does not suggest that the compensation any physician received was dependent on NME's general financial health or profits.[6] Indeed, although Houde and Minavich consistently refer to the physicians as "employees" of NME, the administrative magistrate whose findings of fact form the basis for CRAB's decisions simply found that they were "associated with," or "work[ed] under the auspices of," NME, findings consistent with an employer-employee relationship but also consistent with other, less formal relationships.

On this record, then, the statutory provision designed to deal with the problem of an examining physician's financial bias did

---

[5]"Disability review organization" is not a defined term, nor was it defined in the legislation that inserted the definition of "associated physician." See St. 1987, c. 697, § 32. However, CRAB states in its brief in Houde's case that there is "no dispute" that NME is "a disability review organization." The plaintiffs' briefs do not contest CRAB's assertion.

[6]The record also does not reveal whether NME was a corporation formed under G. L. c. 156B, although, for present purposes, we assume that it was.

not prohibit examination of Houde and Minavich by the NME-associated physicians who examined them. And although Houde and Minavich suggest that a more exacting standard for disqualification, a standard focusing on the umbrella organization and not simply the physicians, is essential for the integrity of the process,[7] it is not the court's province to create additional schemes, standards, or devices for dealing with a problem that already has had the benefit of the Legislature's considered judgment. See *Church* v. *Boston*, 370 Mass. 598, 602 (1976); *Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption*, 392 Mass. 738, 742 (1984); *McHerron* v. *Jiminy Peak, Inc.*, 422 Mass. 678, 681 (1996).[8]

B. *Claims regarding misapplication of standards.* Houde and Minavich's remaining claims focus on what they contend was the panels' misapplication of the standards the panels were required to apply in connection with the panels' examination of applicants for accidental disability retirement. Houde makes two claims about misapplication of standards; Minavich makes one.

1. *Houde's claims.* Houde's first claim centers on the fact that the form each member of the medical panel used to transmit his findings to the board asked the wrong question. The form asked whether Houde was "mentally or physically incapacitated and substantially incapable of performing [her] particular job." Two of the members answered "no" to that question and the third answered "yes." The quoted question embodied the standard for disability retirement set out in G. L. c. 32, § 7(1), before the statute was amended in 1996. At the time Houde

---

[7]On this record, though, it is not certain that focusing on NME itself would change the result, because the dimensions of NME's relationship with the city are unclear. As noted earlier, although the record contains the number of examinations NME performed at the request of the city over a forty-one month period as well as the total amount NME received for those examinations, the record does not contain any evidence that would permit a reasoned judgment about the percentage of NME's gross income those examinations produced or about the effects on NME of a withdrawal of the city's business.

[8]As the plaintiffs have raised only a claim of financial bias, we limit our decision accordingly. Other types of bias require a different analysis. See *Ferraro* v. *Contributory Retirement Appeal Bd., ante* 728, 730 n.4 (2003).

filed her application, however, the amended statute focused on whether the employee was "unable to perform the essential duties of [her] job." G. L. c. 32, § 7(1), as amended by St. 1996, c. 306, § 14.

Use of the wrong question, however, was of no consequence, for the amendment stiffened the standards governing eligibility for accidental disability retirement. Cf. *White* v. *Boston*, 428 Mass. 250, 252-253 (1998). A person can be "substantially incapable of performing [her] particular job," taking into account all of the job's core and peripheral functions and responsibilities, routine and occasional, and nonetheless able to perform that job's "essential duties." The standard the panel members applied to Houde therefore was more favorable to her than the standard the amended statute required.

Houde's second contention is that Dr. Mordecai Berkowitz, one of the panel members, reached his conclusion that she was not disabled by comparing her physical abilities with her written job description. The job description did not say that Houde was required to push what she claims was the heavy cart she was pushing at the time of her injury. In his report, Dr. Berkowitz did say that Houde "should be capable of carrying out her regular job as [a licensed practical nurse] based on review of the job description." However, Dr. Berkowitz also noted that Houde had been injured while "pushing a large medical cart" and that she did "not have sufficient objective findings to preclude her from carrying out the type of . . . work that as a licensed practical nurse she had done previously." Those comments permitted the administrative magistrate to find, as she did, that Dr. Berkowitz's conclusion was based on the work Houde was actually performing and not on a purely theoretical job description.[9]

2. *Minavich's claims.* For his part, Minavich maintains that Dr. Little, one of the panel members who issued a negative

---

[9]The physicians' comments about "high performance athletes," about which Houde also complains, were simply comments about the nature of the surgery Houde had undergone. Those comments did not attempt to compare Houde to high performance athletes or to measure her progress by the progress those athletes would likely make after similar surgery.

report regarding his application, used an impermissible causation standard because Dr. Little opined on the absence of a causal connection between the accident and Minavich's disability instead of opining that such a connection was not medically possible.[10] The latter opinion is what G. L. c. 32, § 6(3)(*a*), the governing statute, requires. See *Noone* v. *Contributory Retirement Appeal Bd.*, 34 Mass. App. Ct. 756, 762 (1993). An opinion containing only the former is a nullity. See *ibid.* See also *Kelley* v. *Contributory Retirement Appeal Bd.*, 341 Mass. 611, 614-616 (1961).

Dr. Little's report and the ensuing correspondence between him and the board created ambiguities regarding precisely what standard he had used.[11] After examining the report, the correspondence, and all of the other evidence, however, the administrative magistrate concluded that Dr. Little had used the

---

[10]Minavich claims that a second panel member, Dr. Gibbons, also used the wrong standard. He did not. True, in his initial narrative, Dr. Gibbons stated that he could not "causally relate [Minavich's] ongoing complaints to the accident." But Dr. Gibbons primarily found that Minavich was not disabled. That finding engendered a board request for clarification. Dr. Gibbons provided the clarification, in the course of which he said:

"After reviewing the records and medical data that was available for my review, and performing a physical examination, it was my opinion that the accident . . . could not possibly have resulted in the symptomatology that [Minavich] presented for the subsequent three or four years from the accident until the time [I] had seen him."

Quite clearly, that was an opinion on the medical possibility of a causal link.

[11]Dr. Little checked a box labeled "no" beneath a question on the transmittal form that asked whether any "incapacity" revealed by his examination of Minavich was "such as might be the natural and proximate result of the personal injury sustained . . . on account of which retirement is claimed." That question embodied the proper standard. In his accompanying narrative, however, Dr. Little did not discuss the possibility of a causal link between the accident and the disability and instead simply said that the accident was not "the cause of" Minavich's disability. The board evidently observed the difference between what Dr. Little said in his report and the language of the box he had checked on the form. Consequently, the board sought from him a supplemental opinion concerning whether the accident, when superimposed on a preexisting condition from which Minavich suffered, "might be the natural and proximate cause of [his] disability." Although the board's inquiry embraced the appropriate standard, Dr. Little responded obliquely, saying that he believed Minavich's disability flowed from "long-standing arthritic changes which [he did not] feel were made more extensive or worse by [the accident], but became more apparent rather than worsened by [the accident]."

proper standard.[12] That finding, generally affirmed by CRAB when it affirmed the decision, was supported by substantial evidence. Although the administrative magistrate's finding is not the only rational view of the matter and although it rests principally on inferences she drew from the correspondence between Dr. Little and the board, "[u]nder the substantial evidence test, a reviewing court is not empowered to make a de novo determination of the facts, to make different credibility choices, or to draw different inferences from the facts found by the [agency]." *Retirement Bd. of Brookline* v. *Contributory Retirement Appeal Bd.*, 33 Mass. App. Ct. 478, 480 (1992), quoting from *Pyramid Co.* v. *Architectural Barriers Bd.*, 403 Mass. 126, 130 (1988). Accord *Hotchkiss* v. *State Racing Commn.*, 45 Mass. App. Ct. 684, 695-696 (1998). Cf. *Fairbairn* v. *Contributory Retirement Appeal Bd.*, 54 Mass. App. Ct. 353, 361 (2002). See generally *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. 246, 257 n.10 (1996). On this record, therefore, we are required to reject Minavich's contention that Dr. Little used an improper standard.

*Judgments affirmed.*

---

[12]That finding seems to contradict the board's finding that both Dr. Little and Dr. Gibbons were "of the opinion that the incapacity was not the result of the injury sustained." The board's finding, however, does not accurately capture what Dr. Gibbons and Dr. Little actually said. See notes 10 and 11, *supra*. More important, the board's view of the matter is at this stage irrelevant. The administrative magistrate heard the application de novo, and as a consequence, we focus on her decision and that of CRAB. See *Namay* v. *Contributory Retirement Appeal Bd.*, 19 Mass. App. Ct. 456, 461-462 (1985); *Dunn* v. *Contributory Retirement Appeal Bd.*, 46 Mass. App. Ct. 359, 361-364 (1999).