SAMUEL A. FORESTA, JR. *vs.* CONTRIBUTORY RETIREMENT
APPEAL BOARD & another.[1]

Suffolk. February 3, 2009. - April 24, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Administrative Law,* Substantial evidence, Judicial review, Agency's interpreta-
tion of statute. *Public Employment,* Accidental disability retirement. *Con-
tributory Retirement Appeal Board.*

Discussion of the Legislature's enactment of St. 1996, c. 306, which reformed
the law governing retirement benefits for public employees in order to limit
the Commonwealth's liability and prevent possible abuses of the system by
requiring an injured public employee who is physically capable of perform-
ing some of the important duties of his position to do so. [676-679]
This court concluded that G. L. c. 32, § 7 (1), permits an employer to modify
an injured employee's work-related responsibilities in order to accom-
modate the injury, thereby revising the essential duties of the employee's
job and, as a result, limiting the retirement system's liability for accidental
disability benefits, where the essential duties of the job as modified are
similar in responsibility and purpose to those performed by the employee
at the time of injury, and result in no loss of pay or other benefits. [679-685]

CIVIL ACTION commenced in the Superior Court Department on
June 30, 2006.

The case was heard by *Linda E. Giles,* J., on a motion for
judgment on the pleadings.

The Supreme Judicial Court granted an application for direct
appellate review.

*James W. Stone (Bernard J. Mulholland* with him) for the
plaintiff.

*Walter M. Foster (Holly A. Ditchfield* with him) for Massa-
chusetts Turnpike Authority Employees' Retirement Board.

*Jennifer Grace Miller,* Assistant Attorney General, for
Contributory Retirement Appeal Board.

[1]Massachusetts Turnpike Authority Employees' Retirement Board (retire-
ment board).

The following submitted briefs for amici curiae:

*Scott C. Merrill* for Lynn Retirement Board.

*Mary Jane McKenna, J. Michael Conley, & Deborah G. Kohl* for The Massachusetts Academy of Trial Attorneys.

*John M. Becker* for Boston Police Patrolmen's Association & another.

GANTS, J. The plaintiff, a former safety inspector in the occupational safety department of the Massachusetts Turnpike Authority (MTA), appeals from a judgment of the Superior Court affirming the denial by the Contributory Retirement Appeal Board (CRAB) of his application for accidental disability retirement benefits pursuant to G. L. c. 32, § 7 (1), as amended through St. 1996, c. 306, § 14. We allowed an application for direct appellate review filed by the Massachusetts Turnpike Authority Employees' Retirement Board (retirement board) to consider a question of significance to employers and employees of the Commonwealth and its political subdivisions: whether G. L. c. 32, § 7 (1), permits an employer to modify an injured employee's work-related responsibilities in order to accommodate the injury, thereby revising the "essential duties of his job," and, as a result, limiting the retirement system's liability for accidental disability benefits. We answer the question in the affirmative when, as in this case, the essential duties of the job as modified are similar in responsibility and purpose to those performed by the employee at the time of injury, and result in no loss of pay or other benefits. We also conclude that CRAB properly determined that the plaintiff was able to perform the "essential duties" of his position of safety inspector as modified at the time of his application for accidental disability benefits. Accordingly, we affirm the judgment.

*Background.* We set forth the background of this case in some detail, relying on facts established at a hearing before the division of administrative law appeals (DALA) and other uncontroverted evidence in the record. In the spring of 2001, the plaintiff had been a section safety inspector for the MTA for twelve years. As a safety inspector, the plaintiff was required to maintain various licenses and certifications in safety. He was the only MTA employee with a fire equipment certificate of competency. His job responsibilities included conducting MTA training sessions on

cardiopulmonary resuscitation (CPR), first aid, fire extinguisher safety, and other aspects of safety awareness; internal safety audits; and industrial accident investigations. One of the plaintiff's primary responsibilities was to conduct weekly inspections of fire extinguishers along the Massachusetts Turnpike and MTA tunnels. This task required the plaintiff to lift fire extinguishers weighing over twenty, and up to fifty, pounds. Fire extinguishers needing maintenance or repair were transported by the plaintiff to an MTA facility in Weston and, after being repaired by others, were transported by the plaintiff back to the assigned locations. The plaintiff performed similar inspection and maintenance tasks, on a monthly basis, on first aid equipment at various MTA sites. Between August, 1999, and August, 2001, the plaintiff traveled an average of 1,500 miles per month in the performance of his job. By his own calculation, only twenty per cent of his work day was spent in the office.

On March 19, 2001, while on duty at an MTA facility in Chicopee, the plaintiff injured his lower back while attempting to lift a fire extinguisher onto an MTA transport van. The plaintiff's lower back injury did not cause him to miss any work, but he experienced low back pain for roughly three weeks. On September 4, 2001, the plaintiff again injured his lower back while attempting to lift boxes of first aid equipment at the MTA's Weston facility. He sought medical treatment and returned to work intermittently during the next year as his medical condition permitted.[2] He received, and continues to receive, workers' compensation benefits. On June 10, 2002, the plaintiff's orthopedic surgeon approved his return to work full time, provided that accommodations for certain medical restrictions could be made. The MTA agreed to accommodate all of the restrictions and advised the plaintiff that his failure to return to the workplace could result in the suspension of his workers' compensation benefits.

The plaintiff returned to work full time later that month. He was provided with a "stand-up computer" and was allowed to

[2]According to the record, the plaintiff twice underwent back surgery, once on April 5, 2002, and again on March 19, 2003. The plaintiff also received multiple epidural steroid injections and participated in several courses of physical therapy. Neither surgery nor injections nor physical therapy was effective in easing discomfort in his lower back, left leg and ankle, and numbness in his left foot.

take as many breaks as needed to reduce his discomfort. The physical duties connected with fire extinguisher safety were assigned to another employee, and facility safety audits were eliminated from the plaintiff's job responsibilities. The plaintiff was responsible for classroom instruction, inspections, investigations, data entry, course development, and report writing. Despite these modifications to his workload, the plaintiff continued to experience back pain. He left work again in July.

On September 23, 2002, the MTA acknowledged that the plaintiff was unable to return to the work duties he had performed before his back injury on September 4, 2001, and expressed its willingness to make every accommodation to ensure his successful return to work "in a modified capacity." On November 1, the plaintiff attempted to return to work on a light duty basis, i.e., working only a few days a week. He was permitted to lift only objects weighing no more than twenty pounds and was allowed to stand or sit, and take breaks from his work as his comfort level allowed. By this time, the plaintiff's responsibilities consisted almost exclusively of administrative tasks. His prior responsibilities in the field were performed by two other employees in the same department, one of whom had obtained a fire equipment certificate of competency in order to perform fire extinguisher inspections. The plaintiff, however, declared himself unable to continue working. His last day of work was November 12, 2002.

On December 23, 2002, the plaintiff submitted to the retirement board an application for accidental disability retirement benefits, pursuant to G. L. c. 32, § 7. The public employment retirement administration commission (PERAC), authorized under G. L. c. 7, § 50, to oversee, monitor, and promulgate rules and regulations applicable to the work of the Commonwealth's retirement boards, G. L. c. 7, § 50, appointed a three-member regional medical panel, as required by G. L. c. 32, § 6 (3), to evaluate the plaintiff's medical condition and to certify to the retirement board in writing whether the plaintiff was likely permanently disabled from further duty.[3]

---

[3]General Laws c. 32, § 6 (3), also directs the panel to certify in writing whether the claimed injury was the natural result of the workplace accident. The medical panel's conclusion that the plaintiff's injury occurred in the course of his employment is not at issue in this case.

On April 17, 2003, the medical panel examined the plaintiff and, based on a list of duties and responsibilities of the plaintiff's position submitted by the MTA, set forth below,[4] certified that he was physically incapable of performing the essential functions of his job. The panel characterized the plaintiff's incapacity as likely to be permanent and expressed its unanimous support for allowing the plaintiff's application for benefits under G. L. c. 32, § 7. Accompanying the panel's certification was a narrative report, which included a finding that the plaintiff was "unable to perform the prolonged driving and lifting from floor level required of his work."

The medical panel's finding that the plaintiff was unable to perform "prolonged driving and lifting" prompted the retirement board to question whether these were among the plaintiff's current job requirements. In a clarification letter dated December 23, 2003, MTA's director of human resources, Frank McDonough, informed the retirement board that "no such tasks were or are specified in the position description applicable to the MTA job [the plaintiff] most recently held." McDonough's letter documented an "evolution" of the position of section safety inspector since that position was created in 1984. The letter presented the following explanation:

> "A fair view of the job today, not as it was created in 1984, would reveal that the position is essentially an office-based administrative job that requires infrequent travel and minimal lifting (virtually all of which can be avoided). It remains, nonetheless, of value to the [MTA] in assisting it in overseeing safety-related data acquisition and review

[4]"Inspects facilities and operating practices throughout the [MTA] to verify that safety standards are maintained, and reports his findings to the Supervisor.

"Inspects safety practices by private contractors on [MTA] property to assure that they conform to [MTA] and [Occupational Safety and Health Administration] standards and reports any violations.

"Assists in the investigation of accidents to identify causes and recommends corrective actions, policies, and procedures which would reduce the likelihood of accidents and/or eliminate physical hazards.

"Advises supervisors of procedures to avoid accidents and claims against the [MTA].

"Maintains control records on all fire extinguishers, inspects extinguishers, and ensures that they are recharged as scheduled."

and providing training, guidance and counsel, at convenient times and readily accessible locations, to supervisors and employees alike. The department's head has necessarily deployed and redeployed her resources in an efficient manner. In doing so, it became apparent quite some time ago that there was less need for [the plaintiff] to drive the Turnpike and more need for office support for those departmental employees and others who fulfill the [MTA's] many safety responsibilities at its facilities and work sites. This decentralization was well underway well before [the plaintiff's] latest injury, and it has continued. Having conferred with the department director, there is no question that [the plaintiff] will be assigned to full administrative responsibilities with virtually no driving obligation and absolutely no lifting requirements."[5]

Based on this revised description of the plaintiff's job, the medical panel reversed its earlier decision and withdrew its certificate. In a report dated February 26, 2004, the medical panel concluded unanimously that the plaintiff was able to perform the essential duties of his job.

On April 28, 2004, the retirement board voted to approve the plaintiff's application for benefits and, pursuant to G. L. c. 32, § 21 (1), forwarded its decision to PERAC. PERAC remanded the decision to the retirement board with written instructions directing that, in the absence of a positive certification by the medical panel, the approval of the plaintiff's application was not in accordance with 840 Code Mass. Regs. § 10.11(3) (1998), and, therefore, was unlawful.[6] PERAC advised the retirement

_____

[5]In a follow-up letter dated January 13, 2004, Frank McDonough clarified for the panel the job responsibility that called for the plaintiff to "maintain control records on all fire extinguishers" and "inspect extinguishers" and "assure that they are recharged as scheduled." McDonough explained the first as "a pure record keeping function." As for the second, McDonough described at length the methods by which inspecting a fire extinguisher may be accomplished without heavy lifting, and made clear that the plaintiff, who instructed others on safe lifting practices, was fully aware of the basic rule that no one is to lift an object without assistance in any case where the lifting might cause an injury. The process of recharging a fire extinguisher, McDonough continued, is not a current responsibility of the plaintiff's job.

[6]Section 10.11(3) of 840 Mass. Code Regs. (1998) provides as follows:

"If the medical panel findings preclude retirement for the disability claimed, the retirement board shall either deny the application or, if it

board that it should either deny the application or, alternatively, petition for a new medical panel, and state the reasons why a new panel should be convened. On July 1, 2004, the retirement board denied the plaintiff's application for disability retirement benefits. The plaintiff filed an appeal from the retirement board's decision with CRAB, which referred the case to DALA. See G. L. c. 32, § 16 (4).

An evidentiary hearing was held before a DALA administrative magistrate, who made findings of fact and remanded the case to the retirement board for the purpose of granting the plaintiff's application, on the ground that a public employee is entitled to disability retirement benefits under G. L. c. 32, § 7, if he is no longer able to perform the essential duties of his *original* job, i.e., the job he held at the time of injury. CRAB adopted the DALA factual findings in their entirety but rejected its legal conclusion that the plaintiff is entitled to benefits. CRAB reasoned that G. L. c. 32 permits an employer wide latitude to modify an employee's work responsibilities to accommodate an injury to keep him on the job, and § 7 entitles an injured employee to disability retirement benefits only if the employee is unable to perform the essential duties of the modified job. CRAB concluded that, because the plaintiff was able to perform the sedentary tasks required of him by the MTA as of December, 2002 (the time of his application for benefits), the plaintiff was not permanently disabled as required by § 7. The plaintiff sought administrative review in the Superior Court, pursuant to G. L. c. 30A, § 14, and, as indicated above, a judge in the Superior Court affirmed CRAB's decision.

The plaintiff concedes that a public employer, such as the MTA, has the right to define the duties that it considers essential for a position within its authority. The plaintiff maintains, however, that because he is unable to perform the "essential duties" of the job he held on the day he was injured, he is entitled to disability retirement benefits under G. L. c. 32, § 7. He claims that CRAB erred, as a matter of law and of fact, in concluding

determines that further examination by a medical panel may be warranted, the retirement board shall petition the [public employment retirement administration commission (PERAC)] to schedule a new examination by a medical panel, stating the circumstances warranting a new examination."

otherwise. We review CRAB's decision under a deferential standard and will reverse only if its decision was based on an erroneous interpretation of law or is unsupported by substantial evidence. See G. L. c. 30A, § 14 (7); *Boston Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 441 Mass. 78, 82 (2004) ("Where an agency's interpretation of a statute is reasonable, the court should not supplant it with its own judgment"); *Flint* v. *Commissioner of Pub. Welfare*, 412 Mass. 416, 420 (1992); *Massachusetts Med. Soc'y* v. *Commissioner of Ins.*, 402 Mass. 44, 62 (1988).

*Discussion.* The first issue before us concerns the proper interpretation of G. L. c. 32, § 7 (1), which conditions entitlement to accidental disability retirement benefits on the certification by a regional medical panel that the applicant is "unable to perform the essential duties of his job and that such inability is likely to be permanent."[7]

In 1996, apparently in response to a series of newspaper articles investigating abuses of the then-current law, the Legislature enacted St. 1996, c. 306, to reform the law governing retirement benefits for public employees. See *White* v. *Boston*, 428 Mass. 250, 253 & n.4 (1998). The new statute made three significant changes in the law relevant to this decision.

First, it tightened the standard governing eligibility for accidental disability retirement. See *Houde* v. *Contributory Retirement Appeal Bd.*, 57 Mass. App. Ct. 842, 849 (2003). Prior to 1996, the statute required that an applicant be "totally and permanently incapacitated for further duty." St. 1996, c. 306, § 14. Under that version of the statute, a public employee was entitled to accidental disability retirement benefits if he could demonstrate a "substantial inability . . . to perform the duties of his particular job or work of a similar nature for which his training and qualifications fit him." *Quincy Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 340 Mass. 56, 60 (1959). As interpreted by the Appeals Court in 1992, a public employee was entitled to these benefits if he could not perform the "full range of duties generally required" in the position. *Retirement Bd. of Brookline* v. *Contributory Retirement Appeal Bd.*, 33 Mass. App. Ct. 478, 483 (1992). Consequently, under the pre-1996 statute, a

---

[7]The permanency of the plaintiff's injuries is not an issue in this case.

public employee who could perform all the essential duties of his position, but not the full range of his duties, would be entitled to retirement disability benefits. See *Houde* v. *Contributory Retirement Appeal Bd., supra* ("A person can be 'substantially incapable of performing [her] particular job,' taking into account all of the job's core and peripheral functions and responsibilities, routine and occasional, and nonetheless able to perform that job's 'essential duties' "). Under the new statute, that same public employee would be entitled to retirement disability benefits only if he could not perform "the essential duties of his job."[8]

Second, St. 1996, c. 306, § 10, established an early intervention plan to ensure the "continued employment of injured members through medical and vocational rehabilitation, reasonable accommodation of injured workers, and a safer workplace." G. L. c. 32, § 5B (*a*), as appearing in St. 1998, c. 252, § 1. Under § 5B (*b*), the early intervention plan "shall be implemented" when a public employee has been absent from work for thirty

---

[8]The phrase "essential duties of his job" is defined nowhere in the statute. PERAC has provided practical guidance for employers and retirement boards called on to determine an applicant's ability to perform the "essential duties of his job" for purposes of G. L. c. 32, § 7, by means of a regulation enacted pursuant to its authority under G. L. c. 7, § 50. Section 10.20 of 840 Code Mass. Regs. (2004) lists the following factors that may (but do not have to) be considered in the determination whether a function or duty is essential:

"(a) The nature of the employer's operation and the organizational structure of the employer;

"(b) Current written job descriptions;

"(c) Whether the employer requires all employees in a particular position to be prepared to perform a specific duty;

"(d) The number of employees available, if any, among whom the performance of the job function can be distributed;

"(e) The amount of time that employees spend performing the function;

"(f) Whether the function is so highly specialized that the person in the position was hired for his or her special ability to perform the function;

"(g) The consequences of not requiring the employee to perform the function;

"(h) The actual experience of those persons who hold and have held the position or similar position; and

"(i) Collective bargaining agreements."

workdays or more as the result of a work-related injury, and his return to work is not imminent.[9] G. L. c. 32, § 5B. If, following the completion of a rehabilitation plan, the employee is "able to perform the essential duties of the position in which he was employed prior to his absence from work," the employee must return to work in his former position. G. L. c. 32, § 5B (*f*). An employee who fails to participate in either the assessment to determine the need for a medical or vocational rehabilitation program or the rehabilitation program determined to be appropriate "shall be deemed to have waived his rights to benefits pursuant to [§] 7."[10] G. L. c. 32, § 5B (*e*).

Third, a public employee previously found disabled who is receiving disability retirement benefits is required to participate in periodic evaluations to determine whether, with the passage of time, he is able to perform the "essential duties of the position" from which he retired or a "similar job within the same department for which he is qualified." G. L. c. 32, § 8 (1) (*a*). See *Sullivan* v. *Brookline*, 435 Mass. 353, 361 (2001) (purpose of 1996 amendments was to "return formerly disabled employees to work and to prevent 'healthy' retirees from profiting at the expense of the taxpayers").

Together, the 1996 amendments limit the Commonwealth's liability and prevent possible abuses of the system by requiring an injured public employee who is physically capable of performing some of the important duties of his position to do so. See *White* v. *Boston*, 428 Mass. 250, 253 (1998). Under the 1996 amendments, when an injured public employee has missed thirty workdays due to a work-related injury, the employer is expected to make reasonable accommodations and, if needed, furnish the employee with a medical and vocational rehabilitation program, to permit the employee to remain on the job. It is only if the

---

[9]The determination that the employee's return to work is not imminent is made by a physician selected by the employee and another selected by the employer. If they disagree, they must select a third physician whose determination shall be conclusive. G. L. c. 32, § 5B (*b*).

[10]The Massachusetts Turnpike Authority (MTA) had not implemented a formal early intervention plan in compliance with G. L. c. 32, § 5B, at the time of the plaintiff's injuries, because it had not succeeded in negotiating the requisite modifications to its collective bargaining agreements. The record reflects, however, that the MTA sought to effectuate the goals of § 5B in its various accommodations of the plaintiff's injuries.

employee still cannot perform the essential duties of the job that the employee may apply for, and receive, disability retirement benefits. If granted such benefits, the now-retired employee must undergo periodic evaluations to determine whether his medical condition has improved sufficiently to permit him to perform the "essential duties" of the position from which he retired or a "similar job within the same department."

The plaintiff contends that the "essential duties of the position of his job" under § 7 must be determined as of the date his injury first caused him to miss work, which here was in September, 2001. He argues that the MTA must provide reasonable accommodation to an injured employee, both as part of an early intervention plan under § 5B and to avoid discriminating on the basis of disability under G. L. c. 151B, but is not empowered to create a new position in order to deny an employee the retirement benefits to which he otherwise would be entitled. In making this argument, the plaintiff confuses what a public employer *must* do under G. L. c. 151B with what it *may* do under G. L. c. 32. To be sure, the MTA owed the plaintiff no obligation to reallocate certain job responsibilities to other employees, or to waive or excuse his inability to perform physical tasks formerly required of his position, as part of a reasonable accommodation under G. L. c. 151B. See *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. 375, 390 (1993); *Dziamba* v. *Warner & Stackpole LLP*, 56 Mass. App. Ct. 397, 405 (2002). There is no language in G. L. c. 32, however, that prohibits an employer from providing a greater accommodation than would be required under G. L. c. 151B, and modifying an employee's essential duties so that he may remain on the job after a work-related injury. If the plaintiff's interpretation were to prevail, the legislative purpose for the early intervention program in § 5B (*a*), "to limit the retirement system's liability for disability benefits by ensuring the continued employment of injured members through medical and vocational rehabilitation [and] reasonable accommodation of injured workers," would be poorly served. The Legislature intended that public employers have substantial leeway to modify the job responsibilities of an injured employee to accommodate the physical limitations imposed by the injury and to keep the employee working at a job he is capable of performing. We therefore conclude that the "essential

duties of his job" under § 7 must be determined after the employer has had a reasonable opportunity to accommodate the injury and, if appropriate, provide medical or vocational rehabilitation to allow the employee to continue to work, which generally will be the date of the application for disability.[11]

CRAB properly determined that § 7 permits an employer to accommodate an injured employee's physical disabilities to avoid the award of accidental disability retirement benefits by "assigning the employee to perform a subset of the essential duties applicable to his or her current position within his or her abilities." We question, however, CRAB's determination that permissible accommodations may include "assigning the employee to different duties altogether within his or her abilities and with no loss of pay or other benefits."[12] We caution that there are limits to the extent to which a department head may alter a job description in order to compel an unwilling employee to continue working at a revised job rather than receive disability retirement benefits to which he otherwise would be entitled. The essential duties of the job as modified must be similar in responsibility and purpose to those performed by the employee at the time of injury, and must result in no loss of pay or other benefits. We draw no bright line to be followed in every case, nor can we, for the determination whether a job is similar in responsibility and purpose

---

[11]We expect that, in the vast majority of cases, as in this case, the public employer will have time reasonably to accommodate the employee's injury before the employee submits an application for retirement disability benefits. In cases where an application is filed before the employer has had a fair opportunity to consider possible revisions to the employee's essential duties that would allow him to keep working, the employer should do so within a reasonable time, after consultation with the employee, and submit a description of the job responsibilities, as modified, to the regional medical panel appointed by PERAC to examine the employee. The modified job description would then be considered by the medical panel in determining whether, under § 7, the employee is "unable to perform the essential duties of his job and that such inability is likely to be permanent." In this way, an employee cannot improve his chance of obtaining retirement disability benefits by rushing to apply for the benefits immediately after an injury rather than allowing his employer to take steps to accommodate, if possible, any temporary or permanent limitations caused by the injury.

[12]The Contributory Retirement Appeal Board (CRAB) made clear that there was no evidence in the record or any claim by the plaintiff that the modified job assignments violated any relevant collective bargaining agreement or statutory requirement, such as our handicap discrimination laws.

necessarily depends on the particular factual circumstances of the employment.

We find support for this limitation in G. L. c. 32, § 8, which requires disabled retirees receiving § 7 benefits to participate in regular evaluations to determine whether they can perform the "essential duties of the position" from which they retired, or a "similar job within the same department." G. L. c. 32, § 8 (1) (a). Under this provision, if an employee's physical condition has improved such that he is able to perform a "similar job within the same department," he must return to work to fill the position if it is vacant and he is otherwise qualified, or risk the loss of his disability benefits. G. L. c. 32, § 8 (2) (a). By directing that a disabled employee may be required to accept a "similar job within the same department" or lose his benefits, the Legislature implicitly recognized that an employer, through a reasonable accommodation designed to allow the employee to continue to work, may modify the job of an injured employee into a "similar job," even if that means modifying his essential duties. If the employer were not given this authority, an employee who could no longer perform his essential duties but could perform a similar job would be granted a § 7 disability retirement but, unless his physical condition had deteriorated, would promptly be ordered back to work under § 8 following his first evaluation because he could still perform a similar job.[13]

We now address the second issue in this case — whether this court must vacate CRAB's decision because the MTA so transformed the "essential duties of his job" that his job was no longer similar in responsibility and purpose to the job he held

---

[13]We also note that, under our workers' compensation law, an insurer paying weekly compensation benefits may modify or discontinue such benefits if the insurer obtains (1) a medical report from the employee's treating physician or an impartial medical examiner declaring that the employee is capable of returning to the job he held at the time of injury "or other suitable job" consistent with the employee's physical and mental condition; and (2) a written report from the employer declaring that such "suitable job" is open and has been made available. G. L. c. 152, § 8 (2) (d). A "suitable job" under c. 152 is defined as "any job that the employee is physically and mentally capable of performing, including light work, considering the nature and severity of the employee's injury, so long as such job bears a reasonable relationship to the employee's work experience, education, or training, either before or after the employee's injury." G. L. c. 152, § 35D (5).

when he suffered his back injury. The plaintiff argues that, even assuming that the MTA was authorized to modify his essential duties following his injury as part of a reasonable accommodation, it went too far in his case. The plaintiff contends that the "essential duties of his job" never consisted of administrative tasks with infrequent travel and no lifting. The plaintiff points to the finding of DALA (which is not disputed) that he was "neither hired for, nor did he ever regularly perform, clerical and administrative duties in his role as Section Safety Inspector" and argues that his revised duties bore little or no relationship to the position he held before his injury.[14] He points out that, in 2004, the MTA hired a new section safety inspector to replace the plaintiff, and this new section safety inspector spends approximately fifty per cent of his time traveling and conducting on-site inspections. The plaintiff asserts that the administrative tasks submitted by the MTA to the regional medical panel as his job description in December, 2003, were so dissimilar from the physical tasks required of him prior to his injuries that CRAB's decision should be deemed invalid. We do not agree.[15]

It is true that, by December, 2002, the MTA had gone to great lengths to accommodate the plaintiff's physical limitations by

[14]The plaintiff relies on language in *Quincy Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 340 Mass. 56, 60 (1959), which interpreted incapacity under G. L. c. 32, § 7, to be the "substantial inability of an applicant to perform the duties of his particular job or work of a similar nature or for which his training and qualifications fit him." This reliance is misplaced. The plaintiff in the *Quincy* case was a former fire fighter who, due to a job-related injury, became unable to climb ladders or engage in other usual duties of a lieutenant in fighting fires. The Quincy fire department reassigned him to desk duty, but this court concluded that the plaintiff was substantially incapacitated from further duty and, therefore, entitled to benefits under § 7. The court's reasoning, however, was based on language contained in the earlier version of § 7, which, as has been discussed, the Legislature altered in 1996 in order to provide employers more flexibility to keep injured employees on the job.

[15]We reject the plaintiff's suggestion that CRAB's failure to consider the definition of the "essential duties" contained in 840 Code Mass. Regs. § 10.20 (2004) renders its decision invalid. As has been explained in note 8, *supra*, § 10.20 was promulgated by PERAC as a guideline for employers called on to submit a job description in connection with an employee's application for § 7 benefits, and for retirement boards considering whether to allow or deny that application. CRAB was not required to apply the factors contained in the regulation when determining whether to affirm the retirement board's decision that the plaintiff was not entitled to benefits.

reassigning and modifying his primary duties as a section safety inspector, shifting his job responsibilities from what had been primarily physical tasks into primarily sedentary ones.[16] The plaintiff's duties in the department, as modified by the MTA to accommodate his injury, did indeed focus far more than before on data entry for various safety programs, report writing, and record retention.

The record also reflects, however, that the fire extinguisher inspection program and on-site safety inspections were not the plaintiff's only responsibilities before September, 2001. The plaintiff's job responsibilities before then included classroom instruction, data entry, course development, and report writing, all of which the plaintiff was able to perform after his injuries. Moreover, after his injuries the plaintiff continued to investigate work-related accidents at MTA facilities (albeit perhaps by telephone) and remained responsible for CPR training course development and instruction to MTA employees on safety procedures and safety awareness in the workplace. In sum, although his most physically strenuous and time-consuming duties were reassigned to other employees, the plaintiff retained substantial employment responsibilities and the fundamental purpose of his job continued to be safety.[17]

Nor were his remaining responsibilities simple to perform or trivial in importance to the MTA's safety mission. The plaintiff has presented no evidence to refute the assessment by MTA's

---

[16]In a memorandum dated October 11, 2002, MTA's director of occupational safety, Diana S. Kilroe, assured MTA's risk and claims administration supervisor that her department would "remain diligent in its efforts to provide [the plaintiff] a productive working position within the department."

[17]Kilroe testified at the hearing before the division of administrative law appeals that the plaintiff's pre-September, 2001, responsibilities had included "investigations of injuries and accidents, audits of various facilities, and a very important part of our department [that is] a pro-active training and implementation of programs necessary to reeducate and educate our personnel on an ongoing basis." Kilroe added, "He's a superb instructor." Kilroe explained that she had assigned the plaintiff, and others in the department, clerical duties that "had been piling up" since 2000 due to a shortage of secretarial help. Kilroe indicated that, because the members of the department were few (varying from four to two), employees tended to share all safety department responsibilities. She stated, "It may be on paper that it's part of their job skill, but everyone is an inspector because our job is to inspect an injury and find a way to fix it so it doesn't happen again."

director of human resources to the retirement board in December, 2003, that the plaintiff in his modified position assisted the MTA in "overseeing safety-related data acquisition and review and providing training, guidance and counsel, at convenient times and readily accessible locations, to supervisors and employees alike." By all accounts, the plaintiff remained a valuable member of the MTA safety team at the time he filed his application for disability retirement benefits.

Having found that the essential duties of the plaintiff's job as modified were similar in responsibility and purpose to those performed by him at the time of injury, we agree with CRAB that nothing in G. L. c. 32 precludes the type of accommodation that was made in this case.

The regional medical panel, relying on the MTA's description of the plaintiff's essential duties as modified by the date of application, found that the plaintiff could perform these duties and therefore was not disabled. On receipt of a certification from the panel establishing that an applicant is able to perform his essential duties, in the absence of a reason to remand for clarification, § 7 permits a retirement board no choice but to deny the application for benefits. See G. L. c. 32, § 7 (1); 840 Code Mass. Regs. § 10.11(3) (1998). Neither the statute nor accompanying PERAC regulations provides for an administrative appeal of a negative certification by a regional medical panel. For all practical purposes, therefore, CRAB's decision to deny the plaintiff's application for benefits was dictated by the medical panel's refusal to certify that the plaintiff was unable to perform the clarified job description submitted by the MTA. See *Kelley* v. *Contributory Retirement Appeal Bd.*, 341 Mass. 611, 617 (1961) (local retirement board may not ignore regional medical panel's findings, unless clear that panel used erroneous standard, failed to follow proper procedure, or its decision is "plainly wrong"); *Malden Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 1 Mass. App. Ct. 420, 424 (1973) (role of regional medical panel in retirement system is to determine medical questions that are beyond common knowledge of local board).

It follows that CRAB's decision that the plaintiff is able to perform the "essential duties of his job" (as modified by the

MTA) was supported by substantial evidence in the record. We conclude that CRAB properly denied the plaintiff's application for accidental disability retirement benefits.

*Judgment affirmed.*